**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 11 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BRIAN THOMAS JEFFREY, also
known as "Jersey,"

Defendant - Appellant.

No. 04-8009

(D. Wyoming)

(D.C. No. 03-CR-109-B)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

Brian Thomas Jeffrey[1] was convicted, following a jury trial, of one count of

conspiracy to possess with intent to deliver more than 500 grams of

methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) and 846

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1]For the sake of consistency with the district court judgment, we refer to
the defendant as Brian Thomas Jeffrey; however we note that his birth name
appears to be, and he is often referred to throughout the record as, Brian Thomas
Jeffery.

(Count 1); two counts of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Counts 2 and 3); one count of distribution of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count 4); one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count 5); and one count of carrying a firearm during and in relation to a drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(I) (Count 6). At sentencing, the district court found that Jeffrey had been convicted of two prior drug felony convictions and sentenced him to a mandatory term of life imprisonment under 18 U.S.C. § 851 on Count 1; 300 months imprisonment on each of Counts 2, 3, and 4, to run concurrently with Count 1; 120 months on Count 5, also to run concurrently with Counts 1-4; and 60 months on Count 6, to be served consecutively to Counts 1-5.

Jeffrey appeals his conviction, contending that the district court erroneously admitted into evidence: (1) hearsay and vouching statements of witnesses; (2) testimony of uncharged misconduct relating to guns and violence; and (3) an inculpatory statement by Jeffrey. He also appeals his life sentence, contending that when the government files, as it did here, a separate information charging that the defendant had committed two prior drug offenses, making him liable under 21 U.S.C. § 851, a jury, rather than the court, must decide predicate facts as

to such offenses. For the reasons stated below, we affirm both the conviction and the sentence.

## BACKGROUND

### A.

On May 22, 2003, a grand jury charged Jeffrey (a/k/a "Jersey"), Robert Dodge, Frank Sisneros, Jesse Elmo Spencer, and Jeremiah Ben Carson with conspiracy to possess with intent to deliver and to deliver more than 500 grams of methamphetamine. The indictment also named Robert Scot Clark as an active participant in the conspiracy, along with Jeffrey's girlfriend, Maryann Montoya. As indicated above, in addition to the single count of conspiracy, Jeffrey was also charged with three additional drug-trafficking counts and two firearms counts.

Trial in the matter was set for October 14, 2003. Prior to that date Jeffrey's co-defendants, Spencer, Sisneros, and Carson, each pled guilty to the conspiracy count (the sole count against them), and testified against Jeffrey and Dodge at their joint trial. Likewise, Clark, Montoya, Elizabeth Morgan, Autumn Williams, and Shannon Jackson also pled guilty to various drug-trafficking charges and testified against Jeffrey and Dodge. In all, the government called twenty-six witnesses, who included, besides the coconspirators, employees of motels who identified registrations and other records in the names of various individuals

-3-

involved in the case; representatives of telephone companies who testified about records showing calls between cell phones and residences connected to the coconspirators; law enforcement officers; and technicians from the state crime laboratory who testified regarding drug identity and amounts. The government's exhibits implicating Jeffrey, in addition to various amounts of methamphetamine, also included paraphernalia for drug use and distribution, scales with traces of methamphetamine on them, two .38 caliber revolvers, and a ledger belonging to Jeffrey containing a record of amounts received from and owed by various individuals for drugs.

According to the testimony, the history of methamphetamine use and dealing by and among individuals identified in this case, including methamphetamine use by Jeffrey, began sometime prior to June 2002. The government's case opened by mostly detailing Dodge's and other coconspirators' activities during the months from June into September 2002. Jeffrey's involvement in a major way covered only a period of a few months, September through the middle of December 2002, when he was arrested. It resumed in 2003 in a smaller way and continued until his arrest again in March 2003. The impetus for Jeffrey's heightened activity beginning in September 2002 was provided by his receipt of more than $100,000 in cash as a settlement for the loss of his leg in

an accident on a job site. The money provided capital for his methamphetamine trafficking.

The concluding event occurred on March 4, 2003, when Shannon Jackson, who was wearing a wire and acting as a police informant, purchased a purported 1.5 grams[2] of methamphetamine from Jeffrey at a motel. This transaction was the basis for Count 4 of the Indictment (distribution).

Notably, Jeffrey did not at trial and does not on appeal develop any specific or substantial challenge to the three drug-trafficking charges contained in Counts 2, 3, and 4 of the Indictment (possession with intent to distribute and distribution of methamphetamine).[3] However, the recitation of facts below includes the government's case on those counts.

---

[2]Jeffrey was charged in Count 4 of the Indictment with distributing 1.5 grams in the controlled buy with Shannon Jackson. Later testing by the crime laboratory revealed that only .8 of a gram was actually methamphetamine; the other .7 of a gram was a non-controlled substance identified by Casper Police Department Sergeant Wnuk as "fake crystal." Tr. of Jury Trial, R. Vol. 6 at 180. Wnuk also testified that the allegation that Jeffrey possessed 1.5 grams was incorrect. The judge ultimately instructed the jury that it need only find possession of a "detectable" amount to find Jeffrey guilty of County 4.

[3]In his closing argument at trial defense counsel virtually conceded Counts 2 and 4 by conspicuous omission, stating to the jury: "What should be the verdict? Count One, not guilty, okay, Count Three, personal use, not guilty, Count Five, not guilty, we don't have credible evidence on the .38s, which we require, okay, and Count Six, not guilty. Thank you." Tr. of Jury Trial, R. Vol. 7 at 48.

Because Jeffrey challenges the conspiracy conviction on the ground that hearsay testimony was improperly allowed, the following summary of the testimony of the prosecution's witnesses consists almost exclusively of testimony which is not specifically challenged in Jeffrey's brief on appeal.

**B.**

**1. Jesse Spencer.** Jesse Spencer testified as follows. In August 2002 he was introduced to Bob Dodge (Jeffrey's codefendant) for the purpose of purchasing a pound-and-a-half of methamphetamine for $13,000 to $14,000, for distribution to and through Tina Stillman, and two others, Steve and Chris, from Sheridan, Wyoming. Dodge drove Spencer to a Motel 6 in Casper where, on a second visit, Dodge took $10,000 from Spencer, went into the motel, and returned with a one-pound cylinder of methamphetamine packaged in layers of plastic wrap with grease in between. Spencer paid Dodge with an eighth of an ounce, and Spencer kept an ounce for his efforts.

Within a few days the same scenario was repeated at the motel. This time Spencer purchased a quarter-pound of methamphetamine for $3000. He gave a small amount to Dodge, used part, and sold part to various customers, one of whom was Jeffrey. A few days later the scenario was repeated except that this time Dodge took Spencer inside the motel room that Dodge had entered

-6-

previously. Inside the room Dodge introduced Spencer to two Hispanics, one named Isidro (nicknamed "Chitto"), and the other unidentified. Dodge gave Isidro the money Dodge had received from Spencer, and Isidro went into another room, returned, and gave Dodge a quarter-pound of methamphetamine. Spencer received the drug, then used and distributed it as in the previous transactions. Spencer, Dodge, Isidro and the other Hispanic repeated the same process a few days later, except that Spencer was short $800 of the purchase price and took some of the drugs on credit (called a "front" or "fronting") for that amount. Spencer and Dodge each took half of the drugs. Spencer used part and sold the rest of his half. On September 13, 2002, Spencer wired the balance owed to Isidro to him at a town in the state of Washington. The Western Union receipt was admitted into evidence. During this period of time, Jeffrey was one of Spencer's "better customers," who got drugs from Spencer both for cash and on a front basis. Tr. of Jury Trial, R. Vol. 4 at 26.

On Spencer and Dodge's fifth trip to the Motel 6, Spencer again went inside Isidro's motel room with Dodge. Isidro was with "another Mexican." Id. at 34. This time Isidro made a telephone call and Frank Sisneros (whose photograph was identified by Spencer in court) soon arrived and was introduced to Spencer. Sisneros gave his telephone number to Spencer who called Sisneros later in the day seeking to purchase methamphetamine. Sisneros then came to Spencer's

house and fronted him six to eight ounces of methamphetamine which Spencer broke into smaller amounts for sale at retail prices to secure approximately $5000 to pay Sisneros. Four days later Spencer went to Sisneros' house to pay him and obtain an additional supply which he both sold and used as usual. It was during this time frame that Spencer wired Isidro's money to him in Washington. This latter method of operation, purchases from Sisneros for use and resale, was repeated three or four more times. Jeffrey continued to be a regular customer of Spencer during this time. Id. at 43.

In late September Spencer placed a call to Isidro's phone which resulted in Spencer calling Sisneros in an attempt to make a larger purchase of one or more pounds. Ultimately Sisneros sold him fourteen ounces on credit, two of which Spencer distributed to Jeffrey.

Spencer considered the quality of all the methamphetamine he purchased from Isidro, Dodge, and Sisneros to be very poor. As a result he never intended to pay for the methamphetamine he was able to get from Sisneros in the last described transaction. These matters, quality and drug debt, resulted in a series of heated telephone conversations between Spencer, Isidro, and Sisneros. And, on one occasion, Isidro, another Mexican, and Sisneros went to Spencer's house, but when Spencer looked at his security video monitor and identified who was at the

door, he did not answer it. Dodge also called Spencer numerous times during this period regarding the debt to Isidro and Sisneros.

In September 2002 Spencer accompanied Jeffrey to Jeffrey's attorney's office where he saw Jeffrey receive more than $100,000 from his lawyer as a settlement for the loss of Jeffrey's leg in an accident. Spencer also testified that during the course of his dealings with Jeffrey, Jeffrey possessed a .25 or .22 caliber handgun, and Spencer sold him an 810 millimeter handgun.

Finally, Spencer testified that after Jeffrey came into money Spencer had many conversations with him, knew he was trafficking in methamphetamine, told Jeffrey they were both being ripped off by Dodge due to the inferior quality of the drug supply, and that on a visit to the residence occupied by Jeffrey and his girlfriend Maryann Montoya, he observed notebook records of drug transactions and saw Montoya writing in the ledger. He also testified that he purchased small amounts of methamphetamine from Jeffrey at least twice, both on front.

**2. Elizabeth Morgan.** Elizabeth Morgan testified as follows. During August and September 2002, she was a purchaser and user of methamphetamine, and she came to know Dodge, Jeffrey, Montoya, and Spencer, among others. She also obtained methamphetamine from Jeffrey and others. She stayed for awhile with Jeffrey and later at a place occupied by Jeffrey and Montoya. During that time she saw Jeffrey on multiple occasions in possession of and distributing

methamphetamine, with one quantity being as large as a softball. She heard him complain that people owed him money. She stated that Dodge came to the house and she heard them conversing about methamphetamine, including its source and quality. She also observed Jeffrey in possession of a .22 or .25 semi-automatic pistol which he kept on the table where the drugs were. Finally, Morgan testified that while at her friend Lori Carson's house she saw on the surveillance video monitor a man, 55 or older, at the back door. He was identified as "Mexican Frank." Id. at 97. Morgan became aware that he was looking for Jeffrey, but Spencer, who was there, also appeared to be avoiding him. Id. In court, Morgan identified a picture of Frank Sisneros as the one known as Mexican Frank. She also identified Dodge at counsel table.

**3. Maryann Montoya.** Maryann Montoya testified that during the period in question she was a user and dealer of methamphetamine in association with Jeffrey. She knew and, with Jeffrey, had dealings with Dodge, Sisneros, Spencer, Jeremiah Carson, John Burnite, Jeremy Bramson, James Rice, Kenny Smith, Robert Scot Clark, and numerous others. She began a live-in relationship with Jeffrey in September 2002, married him in December 2002, and divorced him in July 2003. She testified at length about Jeffrey's drug dealing, including his confederates, through December 10, 2002, when she was arrested after her car

which she was driving, with Jeffrey and Liz Breeden as passengers, was pulled over.

Montoya testified that Jeffrey had about $105,000 in cash which he used to purchase home furnishings, vehicles, and methamphetamine. The significant quantity purchases of methamphetamine followed conversations and association with Bob Dodge. The first transaction involved $10,000 for a pound of methamphetamine. Jeffrey and Montoya in their car met Dodge in his. Montoya, who, by agreement with Jeffrey, usually carried the cash and a gun, gave Jeffrey $10,000 and, at his request, Jeffrey's .25 caliber pistol which she had in her bag. Jeffrey then got into Dodge's car and left Montoya to wait in a convenience store parking lot. Dodge brought Jeffrey back with a pound of methamphetamine wrapped in a cylindrical shape inside alternating layers of saran-like wrap and grease. Montoya and Jeffrey then broke the pound into smaller, bagged amounts for distribution and sale, using scales to weigh out specific amounts. Montoya carried the merchandise and Jeffrey distributed it.[4] Id. at 128-30. In short, then

_____

[4]The following testimony by Montoya is illustrative:

A. It was like I would weigh up, you know, and he would be handed cash and I would be handed the methamphetamine and he would give me the money and he would—I would put it in my bag and he would give the person the drugs.

Tr. of Jury Trial, R. Vol. 4 at 130.

-11-

and thereafter, they worked together, interdependently, including Montoya's maintenance of a drug ledger of their sales and distribution, showing amounts paid and owed. Spencer stated in his testimony that Montoya kept the ledger because she was the more literate of the two. As indicated above, the ledger and scales were introduced into evidence.

About a week after the transaction just described, Jeffrey and Montoya contacted Dodge to get another pound for $10,000 and were directed to go to Dodge's trailer. When they arrived, Dodge introduced them by name to his source, Frank Sisneros (identified by Montoya in court by his picture). Montoya and Jeffrey gave Dodge the money, and Dodge went into a back room with Sisneros and returned with the pound of methamphetamine which he gave to Jeffrey. The pound was in the usual packaging, described above. The almost identical scenario and amounts occurred about a week later at Dodge's trailer, except that this time Montoya and Jeffrey dealt directly with Sisneros. They told him they wanted two pounds, rather than one, whereupon Sisneros left, returning in about twenty minutes with two pounds of methamphetamine for which Montoya and Jeffrey paid him $20,000. Again, the packages were wrapped in the usual distinctive manner, similar to that described by Spencer in his dealings with Isidro and Dodge. Subsequently, Montoya and Jeffrey broke, weighed, and bagged the supply into

smaller amounts which they sold and distributed mainly to John Burnite,[5] Jeremy Bramson, Jeremiah Carson, and James Rice—individuals whose names crop up at various points in the testimony, and all of whose names appeared in Jeffrey's drug transaction ledger, among others.

About a week-and-a-half after the two-pound purchase, Dodge called Jeffrey on behalf of Sisneros, soliciting further purchases. That led to a one-half-pound purchase of methamphetamine by Jeffrey and Montoya from Sisneros at Dodge's trailer. That amount was also both used and distributed by Montoya and Jeffrey.

Montoya stated that during this series of transactions she saw Jeffrey with at least four guns which he kept within reach of where he was distributing drugs: in his lap, sitting next to him, on the bed, and in Montoya's bag. The firearms included the .25 caliber, two 9 millimeters, and a big Colt revolver.

About a week after the half-pound transaction, Dodge came to Motel 6 where Montoya and Jeffrey had temporarily taken a room, in addition to having their apartment, and told them the Mexicans from Washington were back and were at the motel. Id. at 143. He purchased some crystal methamphetamine from Jeffrey. Jeffrey and Montoya subsequently advanced him $3000 to purchase

---

[5]The individual in question was known both as John Burnite and John Faulkner. We use Burnite when referring to him.

methamphetamine from the Mexicans, but Dodge only delivered part. Id. at 145-46.

Shortly thereafter, officers spotted Montoya at the apartment she and Jeffrey occupied and sought entry into the apartment from Jeffrey, who answered the door when they knocked. Upon inquiry, he denied Montoya was there, but let the officers in. They found Montoya hiding in a closet and arrested her on an outstanding warrant for probation revocation. Subsequently, Jeffrey was charged with interference because he lied to the officers about Montoya's presence in the apartment.

After Montoya's arrest at the apartment, she told the police, including, in short order, Agent Brad Wnuk, about the methamphetamine trafficking in which she was involved. That discussion implicated the Mexicans from Washington staying at Motel 6, including a description of their vehicles (as was developed in testimony, outlined below). Thus, when Montoya was released after a few hours, she returned to the Motel 6, and immediately observed police conducting surveillance. She and Jeffrey contacted Jeremiah Carson to come to the motel to pick them up, which he did. John Burnite, Wanda Mills, and James Rice also showed up to help. Rice and his girlfriend Autumn were around Jeffrey and Montoya a lot and were regular purchasers, as was Burnite, for whom Jeffrey

-14-

bought a car. Carson had purchased increasing amounts, up to quarter-pound quantities. Jeffrey bought him a car.

A few hours after Montoya and Jeffrey departed, the Mexicans from Washington were arrested and they, Dodge, and Sisneros, ceased to be sources for Jeffrey's drugs. So Jeffrey turned to Kenny Smith from whom he purchased a pound. Thereafter, Jeffrey and Montoya spoke with Carson and, as a result of that conversation, gave him $7000, and the three drove to the residence of Robert Scot Clark, a/k/a "Smiley," where Jeffrey obtained a little less than a pound of methamphetamine. Montoya and Jeffrey broke up and distributed the amount as before. Shortly thereafter Montoya and Jeffrey returned to Clark's apartment where they consummated a smaller transaction because of limited funds. They saw more of the drug at the apartment, and were offered more to buy, but had no money for more. As usual, for the amount purchased, Montoya gave Jeffrey the money, and Jeffrey gave it to Clark.

Montoya, Jeffrey, and Liz Breeden subsequently went to the apartment of Justin Marshall and his girlfriend Shannon (a different individual than Shannon Jackson whose testimony is outlined below) to collect a drug debt Marshall owed to Jeffrey. Having no cash, Marshall paid part in goods, including two .38 caliber revolvers which are the subject of Count 5 of the indictment. Montoya put one

gun in her bag and Jeffrey took the other gun, which he put under his seat in Montoya's truck.

A short time later, on December 10, 2002, they were pulled over by the highway patrol, resulting in the arrest referred to above. Montoya testified that as the police approached, both she and Jeffrey passed their guns to Breeden in the back seat. During an initial search the police recovered one .38 revolver from the pocket of Breeden's jacket and the other from under her seat. Those guns were identified by Montoya and admitted as exhibits in court. Montoya stated that before the weapons were handed to Breeden, they had both been within easy reaching distance of the drugs in Montoya's purse/duffle bag on the driver's side floor. Id. at 162-64. The arresting officer testified that both guns were loaded and ready to fire. Methamphetamine found in Montoya's duffle bag included that obtained from Clark the night before.

**4. Frank Sisneros.** Frank Sisneros testified that he met Isidro and Miguel (whom he identified at trial by their pictures at the top of the government's organizational chart) at a bar in June 2002. That meeting led to another at Isidro and Miguel's room at Motel 6 where they asked Sisneros if he wanted to sell methamphetamine for them. They displayed a pound of the drug packaged in layers of plastic wrap and grease. Sisneros took an ounce on a front and sold it. Subsequently, Isidro and Miguel came to Sisneros' house and supplied him with

another fifteen ounces. They left, but returned later accompanied by "two other Mexicans" and Bob Dodge, whom they introduced to Sisneros. Tr. of Jury Trial, R. Vol. 6 at 39-40. Sisneros had not met Dodge before, but he fronted Dodge two of the fifteen ounces Isidro had furnished him.

After that, for the next week or two Dodge got more supplies of methamphetamine, and he also introduced Sisneros to "Jesse." Thereafter, Sisneros delivered methamphetamine in varying quantities to Jesse, and Jesse would pay him. Isidro and Miguel brought Sisneros a pound of the drug, all cut up into ounces. Isidro distributed at least two pounds by the end of August. Jesse did not pay for the last eight ounces he obtained, and Sisneros began getting calls from Isidro and Miguel about the debt, leading finally to the fruitless visit to Jesse's house by Sisneros and Isidro in an attempt to collect the debt.

In October 2002 Isidro and Miguel came to Sisneros' house with four one-pound packages of methamphetamine to deliver to Dodge. Four or five days later Dodge showed up in a car with another person in it, later identified by Sisneros as Jeffrey, id. at 66, and gave Sisneros $10,000 in cash for a pound of the drug. Three or four days later Sisneros gave Dodge another pound in exchange for $10,000 cash. In November, in response to a call from Dodge, Sisneros went to Dodge's trailer where he was introduced to a "guy with one leg" (identified by Sisneros in court as Jeffrey), and his "woman," Maryann. Id. at 52, 57. They

-17-

wanted to purchase two pounds of methamphetamine, not just one. So, Sisneros went home, got another pound, returned and gave the two pounds to Jeffrey and Montoya, for $20,000 cash. Three or four days later Miguel and another man came to Sisneros to collect the $40,000 in cash he had received for the four pounds described above. After another visit by these men Sisneros learned they were again staying at Motel 6, and later found out that they had been arrested. Sisneros also stated that at an earlier time he had visited Isidro and Miguel at the Royal Inn, and that they also had stayed at the Shilo.

**5. Jeremiah Carson.** Jeremiah Carson testified that he knew Jeffrey, Montoya, Spencer, Clark, Dodge and others whose names came up at trial. He admitted to being both a user and a seller of methamphetamine. He stated that on one occasion Jeffrey fronted him one ounce of methamphetamine worth $1000, which he sold. Later Jeffrey supplied Carson with two more ounces and told him he would give him two more but had to wait until "his dude came over . . . ." Tr. of Jury Trial, R. Vol 5 at 143. Without objection, Carson said Jeffrey identified his "dude" as Dodge.

Further, Jesse Spencer supplied Carson on various occasions with two-ounce to quarter-pound amounts of methamphetamine, and Carson saw Spencer with as much as a pound of methamphetamine. Carson also related that he and Spencer called each other on cell phones when they were making drug deals. On

at least one occasion each, Carson saw Jeffrey with Spencer and Dodge with Spencer.

On one occasion, Carson was picked up by John Burnite and driven to Jeffrey and Montoya's apartment where he was "chewed out" regarding the unpaid amount he owed Jeffrey for drugs. On that occasion he saw a pound of methamphetamine, in a cylindrical shape, which Jeffrey broke open and shared enough for all of them to get high. Subsequently, Bob Dodge came over and spoke privately with Jeffrey and Montoya, following which Jeffrey fronted Carson another ounce of methamphetamine. Carson used part and sold part.

Carson testified that Montoya and Jeffrey did deals in motels and that one time he met them at Motel 6 to pay some of his debt. Rice was also present. While Carson was there a "Mexican" pulled up and Jeffrey went out and left with him. Still later Carson moved in with Jeffrey and Montoya for about two weeks. During that time Jeffrey and Montoya supplied him with methamphetamine, quantities varying from an ounce to a quarter of a pound. Carson then sold the drugs, paying Jeffrey in part from the proceeds. Carson observed Montoya keeping a ledger, in code, of amounts people owed Jeffrey for drugs. Carson also observed quantities of methamphetamine in the apartment in addition to the amounts supplied to him by Jeffrey. These quantities included pound amounts, and included crystal methamphetamine as well as chud (also known as "crank," a

lower grade than crystal methamphetamine). He also saw various people, including Rice and Burnite, come to the apartment and receive methamphetamine in varying amounts.

As previously mentioned, Dodge also came to the apartment. Notably, on one occasion Jeffrey ran out of drugs. Dodge came to the house and after he left, Jeffrey had a supply, two ounces of which he gave to Carson.

On November 23, 2002, Carson received a call from Jeffrey asking him to pick up Jeffrey and Montoya at Motel 6 because of intense police activity there. When Carson arrived he saw Jeffrey and Montoya putting everything they had in the motel in Jeffrey's car. Rice was also there. Jeffrey and Montoya got in Carson's vehicle and he observed that they were "freaked out" and "scared." Id. at 168. After that date Carson did not think Jeffrey's drug source was active anymore. About a week after the motel exodus, Carson told Jeffrey that he might have an even better source, "Smiley, my friend Scot Clark." Id. at 171. Carson had dealt with him before.

Jeffrey agreed and Carson went to Clark's place and got fronted two ounces of methamphetamine. He told Clark that if Clark would sell pound quantities cheap Carson might be paid by Jeffrey with a car. Carson then agreed on a price of $7000 to $8000 per pound to be paid by Jeffrey. Later Carson got $1000 from

Montoya as part payment for the two ounces he got from Clark, and he paid it to Clark.

Carson testified that he went with Jeffrey and Montoya to a place a few apartments away from Clark's house. Clark, Jeffrey, whom Clark knew, Montoya and Carson were present (Carson learned introductions were unnecessary). Carson stated that Clark pulled a pound of methamphetamine from his pocket, Jeffrey gave him the money, and Clark gave Jeffrey the drugs—less an ounce or more to account for the unpaid amount previously fronted through Carson. Jeffrey then gave Carson the drugs to sell and bought him a car.

Carson testified further that he had often seen Jeffrey with guns within arm's reach during his drug transactions. Those guns included a .38 and a 9 millimeter Hi-Point which Jeffrey lent to Carson from time to time to carry with him on his drug runs for personal protection and to protect the drugs.

Finally, Carson stated that he had observed Jeffrey and Montoya, especially Montoya, using scales to weigh out quantities of methamphetamine, and saw them with quantities of the drug up to pounds. He estimated that overall he distributed about a kilo of methamphetamine for Jeffrey.

**6. Robert Scot Clark.** Robert Clark testified that he was a major dealer in methamphetamine; that in November 2002 Jeremiah Carson asked him to sell to Jeffrey; and that, subsequently, Carson, Montoya and Jeffrey came to his house

and he sold Jeffrey a pound of methamphetamine for $7000. Montoya weighed the drugs on scales she and Jeffrey brought with them. Subsequently, in December, Clark sold an additional amount to Jeffrey.

**7. Autumn Williams.** Autumn Williams testified that she and Rice purchased methamphetamine from Jeffrey, mostly on credit, and that on one occasion she saw a large amount of the drug at Montoya and Jeffrey's apartment.

**8. Keith Wilhelm.** Officer Keith Wilhelm of the Natrona County Sheriff's Department testified that on November 23, 2002, he participated in the surveillance of the two Hispanic males being investigated by Agent Brad Wnuk. The surveillance took place at Motel 6, the same motel where Jeffrey and Montoya had a room, and Dodge had visited in November 2002, and from which Jeffrey and Montoya, seeing police activity, hurriedly departed in Carson's vehicle on November 23, 2002.

Officer Wilhelm stated that the surveillance revealed three, not two, Hispanic males and two vehicles with State of Washington license plates, with registrations from Othello, Washington, belonging to them. During the surveillance the individuals being investigated drove around Casper and, among other things, met with Frank Sisneros.

Later in the evening of November 23 officers stopped one of the vehicles as it left an Albertson's parking lot. The three males inside the vehicle were

identified as Victor Manuel Colmenares, Miguel Angela Pena-Ramos, and Isidro Rodriguez-Pena—all of whom were identified by Wilhelm in court by way of photographs. The car and its occupants were at first allowed to proceed, then stopped again a short time later, and the occupants were arrested, and turned over to Agent Wnuk.

Officer Wilhelm testified further about his participation with Agent Wnuk and other officers in a search of the Hispanics' motel room the next day, November 24. He also assisted in a search of Robert Scot Clark's residence on December 11, 2002. That search turned up methamphetamine, packaging materials for drugs, and a cell phone, from which officers produced a page-and-a-half record of calls. Wilhelm further stated that Clark's cell phone had numbers on it for Carson, a/k/a "Miah," Paul Rodriguez, a/k/a "Pablo," who was Carson's friend and primary customer, and Jeffrey and Montoya. Clark's phone also showed that Jeffrey had made a call to Clark earlier that day, December 11.

During the search in question, Wilhelm also found and examined a Palm Pilot which revealed some addresses and phone numbers and code for amounts, and a notebook with what appeared to be figures showing amounts paid and owed, all of which the officer associated with drug transactions.

**9. David Keane.** David Keane, a state highway trooper, testified that on December 10, 2002, he had cause to detain a specific automobile which he had

-23-

previously spotted and pulled over. The vehicle was being driven by Montoya, who, it was discovered, owned it. Jeffrey was in the front passenger's seat, and Liz Breeden was in the back seat. Breeden was arrested when the officers found her in possession of a loaded .38 caliber revolver, which she had in her pocket, and also on outstanding warrants. The officers found another loaded .38 caliber revolver under her seat. Officers determined that the two guns had been stolen. After an initial search revealed drugs and paraphernalia in the duffle bag/purse which was on the driver's side floor of the vehicle, Montoya was arrested for possession of a controlled substance. A full search of the bag and materials concealed on Montoya's person ultimately turned up three bags, two containing marijuana, and the third containing a large rock of methamphetamine. Keane and another officer testified that upon a later detailed search of Montoya's bag, the police found hypodermic needles, 30-40 one-inch baggies which were typical of use for retail drug distribution, marijuana, chud, methamphetamine, and crystal methamphetamine, which together weighed approximately 32 grams.

**10. Aaron Shatto.** Deputy Aaron Shatto testified that on December 14, 2002, he was notified that Jeffrey, who by that time had an outstanding warrant on the charge of interfering with an officer, was in the parking lot of the Natrona County Detention Center where he had gone to bail Montoya out of jail. When Officer Shatto arrived, he arrested and handcuffed Jeffrey, then conducted a search

of his vehicle. The search turned up drug paraphernalia (pipe and spoon), baggies in the ashtray containing marijuana, and what the officer field-identified as more than three grams of methamphetamine. He also found $546 in cash in Jeffrey's possession.

**11. Shannon Jackson.** Shannon Jackson, a methamphetamine user and seller, was Jeffrey's friend and lived with him for a time during which she purchased drugs from him. During that time she also drove him around, "helped him deal and I carried a gun for him for protection." Tr. of Jury Trial, R. Vol. 5 at 105. She testified further that 90 percent of the time that she was with Jeffrey he had a gun in his possession, "[u]sually sticking it on the table, so like an intimidation factor . . . [toward] whoever was in the room." Id. Subsequently, Jackson was arrested and jailed for forgery and possession.

In March 2003, at the behest of police, Jackson was fitted with a wire and went to the Colonial Motel to effect a controlled buy of methamphetamine from Jeffrey. When she arrived there was a Hispanic male in the room. He went into the bathroom and did not reappear. Jackson then purchased from Jeffrey both chud and crystal methamphetamine, similar to types of the drug she had previously seen in Jeffrey's possession in the same motel room. The drugs were in plastic bags. Jackson then left and returned to the police station where she delivered the drugs to Agent Brad Wnuk. Jackson testified that on the various occasions when

she had purchased methamphetamine from Jeffrey she sold part "[b]ecause that's how I got my drugs." Id. at 119.

**12. Motel, Telephone, and Western Union Records.** The government called five witnesses qualified to authenticate motel registrations and records for Motel 6, Quality Inn, Super 8, and Royal Inn motels in Casper, Wyoming, and the Shilo Inn motel in Evansville, Wyoming, close to Casper. The records, and in one instance, personal observation, established numerous visits from June through November by, variously, individuals with addresses in Othello, Washington, fairly identified by these addresses and name variations as Isidro Rodriguez-Pena, Miguel Angela Pena-Ramos, Victor Colmenares, Montoya and Dodge, as well as a Leticia Cervantes and a Mariselva Ponoe. One of the witnesses identified registrations and records showing that Spencer (who had a residence in Casper) had stayed at the Quality Inn (formerly the EconoLodge) four times during August, September and October 2002, and that Robert Dodge (who also had a residence in Casper) had taken a room at the same time Spencer was there on October 18-19, 2002. In the instances described above, the registrations and records were introduced into evidence. Telephone records associated with statements for the rooms were also admitted into evidence.

The government also called three witnesses representing various telephone and cell phone carriers, and they identified calls to and from telephone or cell

phone numbers associated with Dodge, Spencer, Isidro, Miguel, and Sisneros. Agent Wnuk, in separate testimony, summarized the interconnection between the calling numbers, including numbers for Jeffrey and Montoya.

**13. Brad Wnuk.** The government called Sergeant Brad Wnuk of the Casper Police Department as its final witness. During the time period in question Officer Wnuk worked as a special agent with the Central Enforcement Team of the Wyoming Division of Criminal Investigation, focusing on controlled substance offenses.

Agent Wnuk described how he became involved in the investigation, arrests, applications for search warrants, and searches in this case. On November 23, 2002, Montoya, who had been arrested on an outstanding warrant at the apartment she shared with Jeffrey, expressed a desire to speak to someone regarding what she knew about methamphetamine trafficking. She was brought to Agent Wnuk, where she told him of multiple pound transactions involving Jeffrey, Dodge, and Sisneros, and that methamphetamine was coming from some "Mexicans" from Washington. She indicated that they were staying at Motel 6. As a result, Wnuk activated officers to begin surveillance on the motel and the two vehicles described by Montoya as belonging to the men from Washington. Shortly thereafter the surveillance team grew from three agents to six, including agents from the DEA and INS.

Agent Wnuk went on to describe the vehicle stop and arrest of Victor Manuel Colmenares Salcedo, Isidro Rodriguez-Pena, and Miguel Angel Pena-Ramos, and the seizure of cell phones in the possession of Isidro (on the account of Leticia Cervantes) and Miguel (on the account of Augustina Pena). Phone numbers for both were identified and matched by Wnuk in court to telephone records earlier introduced into evidence. The agent then tied Sisneros' phone number to that found on calls on Isidro's cell phone, and in his phone book. A piece of paper later seized from one of the suspect's vehicles also had Bob Dodge's number written on it.

Next, Agent Wnuk described the search of the suspects' room at Motel 6. It revealed methamphetamine and other controlled substances. He also stated that a search of the suspects' truck revealed places in the gas tank and dashboard which had been altered so that they could be used to contain and conceal goods (including drugs, money or both). Papers in the truck traced it to 370 South Reynolds Road, Othello, Washington, Isidro's address.

Subsequently, as the testimony went, Bob Dodge's house at 16 Cacti was searched, and officers seized telephone bills and a list of long-distance calls for that address. The stop and search of Montoya's vehicle was also described, and, based on information received from Montoya, Robert Scot Clark's residence was placed under surveillance, during which James Rice drove by and was later

arrested on an outstanding warrant. Based on information (not detailed in the testimony) obtained from Montoya and Rice, Agent Wnuk obtained a warrant, searched Clark's residence and, later, interviewed Clark.

The government then introduced through Agent Wnuk summary exhibits depicting telephone calls to and from the residences and cell phones of Isidro, Miguel, Dodge, Spencer, Sisneros, and Jeffrey. Over the period of time in question, the number of calls was very substantial, sometimes running into the hundreds and, at one point, October 19-24, there were so many calls involving the phones of Isidro, Miguel, Dodge, Jeffrey, and Spencer the agent "couldn't even count them all." Tr. of Jury Trial, R. Vol. 6 at 170. He stated that it would take "several days to compile the data. You can look at it and see it [from looking at the lists of calls shown on phone records in evidence], but I can't explain it without just giving everybody a headache." Id. The calls showed interconnection among the phones in question, and, notably, Agent Wnuk pointed out a pattern of calls from one phone to another within a very short time, sometimes minutes, around some of the significant dates and events identified in the testimony set out above.

Agent Wnuk also testified at length regarding the controlled buy of methamphetamine from Jeffrey by Shannon Jackson in March 2003 and the interview with Jackson leading to that event.

Finally, Agent Wnuk related that in April 2003 he went to Jeffrey's motel room along with probation and parole personnel. Wnuk searched the room and found controlled substances, and arrested Jeffrey for possession of a marijuana pipe. At the end of the encounter, but not in response to any questions from the officers, Agent Wnuk testified that Jeffrey said he "was a big boy and he could do his time." Id. at 186.

## DISCUSSION

### A.

Jeffrey challenges the admission of certain testimony on various grounds, including hearsay which was not subject to any exception or exclusion under the Rules of Evidence; improper vouching for the credibility of witnesses; allegedly prejudicial testimony about uncharged misconduct relating to Jeffrey's possession of guns, and prior acts of violence; and the allegedly improper testimony of Agent Wnuk about the single inculpatory statement made by Jeffrey.

We review evidentiary rulings by the district court under the deferential abuse of discretion standard. United States v. Davis, 40 F.3d 1069, 1073 (10th Cir. 1994). We give heightened deference to the trial judge's decisions when reviewing hearsay determinations. United States v. Hernandez, 333 F.3d 1168,

1176 (10th Cir. 2003), cert. denied, 540 U.S. 992 (2003); United States v. Jones, 44 F.3d 860, 873 (10th Cir. 1995).

We review any non-constitutional errors in the admission of evidence under the harmless error standard. A non-constitutional error, such as a decision whether to admit or exclude evidence, is considered harmless "unless a substantial right of [a] party is affected." See Fed. R. Evid. 103(a); Fed. R. Crim. P. 52(a); see also United States v. Velarde, 214 F.3d 1204, 1211 (10th Cir. 2000). We have defined an error affecting a substantial right of a party as "an error which had a 'substantial influence' on the outcome or [which] leaves one in 'grave doubt' as to whether it had such an effect." Velarde, 214 F.3d at 1211 (quoting United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946))). We review the record as a whole. The government bears the burden of proving that an error is harmless. Id.

Finally, we review de novo whether any constitutional error was committed, United States v. Sarracino, 340 F.3d 1148, 1158-59 (10th Cir. 2003), cert. denied, 124 S. Ct. 1105 (2004), and any non-structural constitutional error for harmlessness beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24 (1967); United States v. Gomez, 67 F.3d 1515, 1528 (10th Cir. 1995).

**1.**

Excluding arguments regarding Agent Wnuk's testimony, which we treat separately below, Jeffrey's brief contains five pages of allegedly inadmissible hearsay statements, objected to at trial, from Spencer, Montoya, Clark, Carson, David Young, and Sisneros. Appellant's Br. at 8-12. The statements are all in the same vein; so, as examples, we repeat the challenged statements of the first three witnesses listed in the appellant's brief as follows:

Jesse Spencer testified, among other things, that:

- Dodge said he "could provide [Spencer] with 'some weight' in drugs."
- Dodge said "that his source for methamphetamine were some 'Mexicans.'"
- Dodge said "smaller amounts had to go through Sisneros."
- Sisneros said he "called Washington about drugs, and the Washington source called Spencer and said to go to Frank Sisneros' house."
- Sisneros said his drug sources were Isidro and Damian.
- Dodge said that "the debt he owed the 'Mexicans' would be added to his debt."

Appellant's Br. at 8-9.

Maryann Montoya testified, among other things, that:

- James Rice told Jeffrey that "he should not allow people to nickel and dime him, that his money would be gone fast and he should go in bigger quantities."
- Dodge said he "could get Mr. Jeffrey a pound of methamphetamine, that there were two different kinds and he could get a pound of each."
- Dodge said "his source was 'Mexicans.'"
- Dodge told Sisneros that Jeffrey and Montoya "were the ones buying the pound with cash up front."

- Dodge said he "owed $10,000.00 and was accountable for the $10,000.00 because he had introduced an individual to them who did not pay [and] he was afraid of being killed."
- She "talked to the police and told the police of the one or two-pound transactions that they were involved with."
- Jeremiah Carson said that "he would set it up with Smiley [Clark] and we would go over to the apartment to meet him and purchase methamphetamine."

Id. at 9-10.

Robert Clark testified, among other things, that:

- Jeremiah Carson told him Jeffrey and Montoya were his source for the methamphetamine he was selling, and that they would pay high dollar for some methamphetamine.

Id. at 10.

It could be argued that many of the statements objected to were admissible on grounds that they were not offered for the truth of the matter stated or on other grounds. Most of these, for example, are simply direct testimony of the witness as to his or her actions which also involved other individuals, places, conduct, and personal perception.[6] Or, they could be admissible as part of the res gestae, to give context to or explain the actions the witnesses took, or as an admission of a party admissible under Fed. R. Evid. 801(d)(2)(A). But the main battleground in

---

[6]See United States v. Mobile Materials, Inc., 881 F.2d 866, 871 (10th Cir. 1989) ("The direct testimony of a conspirator . . . describing his participation in the conspiracy and the actions of others is not hearsay, and the cases concerning co-conspirator hearsay under Rule 801(d)(2) are inapplicable."); United States v. Smith, 692 F.2d 693, 697-98 (10th Cir. 1982) ("Rule 801(d)(2)(E) . . . [is] irrelevant to the direct testimony of a coconspirator." (emphasis in original)).

the briefs, especially the government's brief, is whether the bulk of the statements were admissible under the coconspirator exclusion to the hearsay rule provided in Fed. R. Evid. 801(d)(2)(E). As relevant here, that rule provides for the admission of an out-of-court statement "by a coconspirator of a party during the course and in furtherance of the conspiracy."

This exclusion comes with requirements. In admitting purported coconspirator testimony as non-hearsay, a district court must determine that the statements fall within Fed. R. Evid. 801(d)(2)(E)'s definition. Bourjaily v. United States, 483 U.S. 171, 175 (1987). In this circuit, a trial court must find that (1) by a preponderance of the evidence a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy. United States v. Owens, 70 F.3d 1118, 1123 (10th Cir. 1995) (citing United States v. Urena, 27 F.3d 1487, 1490 (10th Cir. 1994)). These factual determinations can be made in two ways. The district court may hold what is usually referred to for shorthand purposes as a "James" hearing[7] outside the presence of the jury. Owens, 70 F.3d at 1123. Or, it may admit the statements on the condition that the prosecution "connect up" the evidence and prove the existence of the predicate conspiracy through trial

---

[7]Following the requirements discussed in United States v. James, 590 F.2d 575, 582 (5th Cir. 1979).

testimony or other evidence.  Id.  Subject to the exception discussed below, a trial

court's failure to make Rule 801(d)(2)(E) findings on the record is an abuse of

discretion.  United States v. Rascon, 8 F.3d 1537, 1539 (10th Cir. 1993).  In such a

case, we are to first assume that the challenged statements are inadmissible, then

assess whether their admission was harmless error.  United States v. Perez, 989

F.2d 1574, 1581 (10th Cir. 1993).  When a trial court fails to make on-the-record

findings and the admission of the coconspirator hearsay is not harmless, we can

retain jurisdiction and remand to the district court to make the 801(d)(2)(E)

findings it failed to make in the first instance.  Id.  If it does so, the conviction

stands, subject to further review of the trial court's findings by this court if such

review is sought by the defendant.  Such a review would be under the abuse of

discretion standard applicable to rulings on the admission of evidence generally.

If, however, the trial court determines that the 801(d)(2)(E) findings have not been

established, a new trial is necessary.  Id.

Compliance with the coconspirator statement exclusion in this case is

problematic.  On the one hand, Jeffrey correctly points out that the district court

did not formally and in specific words make the required findings on the record

during the trial, despite objections from Jeffrey's counsel on hearsay and

confrontation grounds.  On the other hand, the government correctly points out

that prior to trial the court did hold a James hearing on a motion by counsel for

Sisneros, and entered on the consolidated record in this case an eleven-page order

making the required findings, including a finding that:

> A conspiracy to distribute methamphetamine existed between
> [Sisneros], Brian Thomas Jeffrey, Robert Dodge, Jesse Spencer,
> Marianne [sic] Montoya, Isidro Rodriguez-Pena, Miguel Pena-Ramos,
> Victor Colnares-Saucedo [sic], James Rice, Frank Spencer, Heather
> Carrillo, Elizabeth Morgan, and Robert Scott [sic] Clark.  The
> conspiracy existed between June 2002 and May 2003.

Order on Def's [Frank Sisneros] Mot. for a James Hr'g, No. 03-CR-109-2B, at 8

(D. Wyo. July 29, 2003).

As shown by the district court docket, and not disputed by Jeffrey, the order

was entered on the consolidated docket of this case relating to all the indicted

defendants, and a copy was provided to counsel for each defendant, presumably

including counsel for Jeffrey.  Furthermore, neither prior to nor at trial was any

comment, motion, or objection made by Jeffrey's counsel as to the applicability of

the court's findings to Jeffrey.  Nor did Jeffrey's counsel even allude to any

coconspirator hearsay findings required under the rules during the trial or in his

motion for acquittal at the close of the trial, with one exception.  Perversely, when

the government put on a witness, Timothy David Young, peripheral to the

conspiracy, and began asking him about who introduced him to Jeffrey, Jeffrey's

counsel spoke up at that time and told the court that as to that witness's testimony

" . . . maybe I can also suggest this is [an] 801(E)(2)(E) [sic] statement.  I think we

may need to have a hearing in this regard."  Tr. of Jury Trial, R. Vol. 5 at 208.

-36-

The government argues that under these circumstances the court's <u>James</u> hearing findings in response to Sisneros' motion satisfy the requirements of the coconspirator statement rule for Jeffrey's trial. Notably, Jeffrey's Reply Brief does not address these arguments.

Nevertheless, the problems with the government's position are manifold. Neither Jeffrey nor his counsel were at Sisneros' <u>James</u> hearing;[8] and, the court's order was specific only as to hearsay statements made by the coconspirators to DCI agents and the testimony was not presented in that fashion at trial. More particularly, neither the district court nor government counsel displayed the slightest indication at Jeffrey's trial that hearsay objections by Jeffrey's counsel to coconspirator hearsay statements were countered by the Sisneros <u>James</u> Hearing Order. Rather, to the contrary, as the following statement made by the district court to the jury toward the beginning of Spencer's testimony (the first witness) indicates, the court had in mind that the required findings were yet to be made.

> [W]hen counsel has risen and said objection[,] 802, what they're referring to is a rule of evidence, which is number 802. And it basically says that hearsay statements, which are statements out of court, not in the presence of the defendant, <u>may not be received unless those statements are received in the course of a conspiracy. And they're objecting on the ground there isn't evidence of conspiracy. I think [the witness] is in the process of laying it, and, therefore, I have received these statements.</u>

---

[8]The appellant's brief raises no due process issue as to whether Jeffrey's right to be present at every stage of the proceedings is implicated.

Tr. of Jury Trial, R. Vol. 4 at 23-24 (emphasis added). Government counsel was silent regarding the court's statement, evincing acquiescence.

Jeffrey's argument is, at most, a matter of form over substance. Most of the arguably challengeable statements are coconspirator hearsay on their face, and it is crystal clear from the record that, if reminded about or challenged as to the rule's requirements, the district court would have instantly made the necessary findings on the record. Indeed, Jeffrey's counsel essentially concedes that he was not prejudiced by the lack of a formal finding.

Furthermore, while Jeffrey seeks a remand due to the district court's technical oversight, our research reveals remand to be an extraordinary remedy. In the eighteen years since the Supreme Court held in Bourjaily that 801(d)(2)(E) was firmly rooted and required no separate inquiry into reliability of coconspirator statements, Bourjaily, 483 U.S. at 182, literally hundreds of cases dealing with this issue have been decided. Of these, only a minuscule number were remanded or reversed due to a trial judge's failure to make formal 801(d)(2)(E) findings. In our circuit, we found only one such case, Rascon, 8 F.3d at 1541, where we remanded for findings because of the unusual state of the evidence. Id. at 1540. Notably, our search indicates that the remand did not change the result for the defendant. Similarly, of the handful of cases remanded in the past eighteen years by our sister

circuits for the failure to make 801(d)(2)(E) findings, we found very few cases in which a defendant's conviction was overturned as a result.

As noted above, it is generally an abuse of discretion for a trial court to admit coconspirator statements without making explicit 801(d)(2)(E) findings.[9] However, we have held that "a case could arise in which the record demonstrates without any question that the trial court did make the requisite inquiry [under 801(d)(2)(E)] even though no formal findings appear. . . . In [this] event, a remand would not be necessary." Perez, 989 F.2d at 1582 n.3. This is such a case. The pretrial James hearing as to Sisneros enabled the judge to evaluate the evidence relating to all the conspirators, and that evidence was not significantly different from that actually offered at Jeffrey's trial.

Alternatively, assuming, arguendo, that the judge committed error by admitting these coconspirator hearsay statements, we conclude that the error was harmless. The extensive direct testimony set out in detail above made substantially the same points as the challenged testimony. That direct testimony was independently corroborated by evidence of drugs, drug paraphernalia, guns, motel registrations, telephone records, pay/owe ledgers, scales, vehicles fitted with

---

[9]Our cases do not describe any particular form of or detail to be included in such findings. Presumably, they could consist of a single declarative sentence—a point to be kept in mind when considering the utility of a remand for findings. See, e.g., Rascon, 8 F.3d at 1541.

secret compartments for carrying contraband, and more, all linking or reasonably inferring linkage between and among the coconspirators.

We arrive at the same conclusion as to the passing references in Jeffrey's brief, with no developed specific arguments, to (a) evidence by the government as to proffers (and plea agreements of witnesses who pled guilty and agreed to testify truthfully in exchange for acceptance of responsibility reductions in offense level and downward departure motions by the government for substantial cooperation—see Appellant's Br. at 14-15);[10] (b) confrontation (on which he cites no authority, is not witness specific, and which, in any event, in fact was accorded as to every major point and witness); and (c) other miscellaneous matters. Error, arguendo, on those points was both harmless and—assuming, again arguendo, that the standard by some stretch applies—harmless beyond a reasonable doubt.


**2.**

Agent Wnuk's testimony is challenged on multiple grounds, including improper vouching for the truthfulness of the government witnesses to bolster

---

[10]Passing references in the appellant's brief to proffers/confessions and related matters do not cite to the record, cite any cases, for instance, regarding the admissibility of plea agreements (especially when the main defense targeted those agreements as incentives to lie on the stand), or develop any arguments. Thus, we do not address them.

witness testimony, erroneous admission of prior consistent statements, and the hearsay admission of confessions.

As indicated above, Agent Wnuk, as the lead investigator in this case, testified at length. During that testimony he related how Montoya, after her arrest in November, spoke to him and related her drug-trafficking activities in detail, implicating Dodge, "some Mexicans from Washington," and others. Tr. of Jury Trial, R. Vol. 6 at 133. Her statement to Wnuk led to the surveillance at Motel 6 described above. During questioning on this subject government counsel elicited from Wnuk the statement that he had been present at Montoya's later proffer, and that the proffer gave details about the first one-pound purchase involving her, Jeffrey, Dodge and Sisneros. Id. at 133-34. Montoya had, as set out above, already testified to these facts at trial, and was cross-examined.

Government counsel did the same thing when he questioned Wnuk about Clark. Wnuk testified that Clark's proffer detailed the one-pound methamphetamine sale, also described above in the trial testimony of Montoya, Carson, and Clark—all of whom were subject to cross-examination. Id. at 156.

Government counsel did largely the same thing again when questioning Wnuk about Jesse Spencer. Government counsel said: "I don't want to go over that [the statement] piece by piece, the jury's heard it, but was the statement he gave on that day consistent with the testimony he gave in court?" to which Agent

Wnuk responded: "It changed very little." Id. at 172-73. Defense counsel objected to all of the above statements.

Prior consistent statements are admissible only if they are made before an influence or motive to fabricate arises. Tome v. United States, 513 U.S. 150, 167 (1995). A motive to fabricate testimony may arise as soon as a defendant is arrested, not just after a plea bargain is reached. United States v. Moreno, 94 F.3d 1453, 1455 (10th Cir. 1996).

Likewise, direct testimony which does nothing more than vouch for the credibility or truthfulness of a witness on a particular occasion, as opposed, for instance, to giving testimony regarding a witness's general character or reputation for truthfulness, is inadmissible. See United States v. Charley, 189 F.3d 1251, 1267 (10th Cir. 1999) (citing authorities).

The statements in question by Agent Wnuk violated both of those rules and the district court abused its discretion by admitting them. Accordingly, we evaluate those errors under the harmless error standard, set out above. For reasons already stated, we conclude the errors were harmless. The evidence, including independent corroborating facts, overwhelmingly supports the verdict.

**3.**

As outlined above, during the trial witnesses were permitted to testify about Jeffrey's possession of multiple firearms, in a variety of settings, in addition to testimony regarding the .38 caliber revolvers which are the subject of Counts 5 and 6 of the indictment. Jeffrey contends that the admission of testimony regarding any firearm other than the .38 revolvers violated the four-part test for admissibility set out in Huddleston v. United States, 485 U.S. 681, 691-92 (1988), including serving no proper purpose under Fed. R. Evid. 404(b).

We disagree. Rule 404(b) only applies to acts extrinsic to the crime charged. Evidence of acts intrinsic to, inextricably intertwined with, or a necessary preliminary to the crime charged, is admissible. See United States v. Green, 175 F.3d 822, 831 (10th Cir. 1999); United States v. Lambert, 995 F.2d 1006, 1007 (10th Cir. 1993). The use of firearms is a well-established characteristic of the drug distribution business; and, the use of firearms is probative of the accused's participation in the business. Green, 175 F.3d at 831; United States v. Martinez, 938 F.2d 1078, 1083 (10th Cir. 1991). The district court did not abuse its discretion in admitting the evidence in question.

Jeffrey also challenges, on the same grounds, the admission, on redirect examination of Montoya, of evidence of a single act of domestic violence—a time when Jeffrey held a knife to Montoya's throat. The district court ruled that

-43-

defense counsel opened the door to that inquiry on cross-examination. We conclude that the district court did not abuse its discretion in allowing the testimony.

**4.**

Finally, Jeffrey argues that the district court erred when it allowed Agent Wnuk to repeat Jeffrey's statement that he was "a big boy" and could "do [his] time." Tr. of Jury Trial, R. Vol. 6 at 186. Jeffrey contends that the statement was allowed in violation of his Fifth Amendment right to remain silent.

The district court ruled that the statement was voluntarily made and was admissible. Id. at 182. We review the question of voluntariness de novo, and the district court's underlying factual findings for clear error. United States v. Muniz, 1 F.3d 1018, 1021 (10th Cir. 1993). For Fifth Amendment protections to apply, the suspect must be in custody and interrogation, in some form, must be occurring. See Yarborough v. Alvarado, 124 S. Ct. 2140, 2147-48 (2004); United States v. Rambo, 365 F.3d 906, 909 (10th Cir. 2004). If a person voluntarily speaks, without interrogation, Fifth Amendment protections do not apply. Muniz, 1 F.3d at 1022. Voluntariness is subject to a totality of the circumstances test. Id. Ultimately, "[t]he test is whether the person's will was overcome, or whether the statement was freely made." Id.

We have reviewed the record and conclude that the district court did not err by allowing the testimony as a volunteered statement by Jeffrey, not made in response to interrogation.

**B.**

Prior to sentencing, the government filed an information charging Jeffrey with having been convicted in Wyoming state court of narcotics violations on two prior occasions. Accordingly, at sentencing the district court held a hearing and found that Jeffrey had two prior convictions as charged. He therefore sentenced Jeffrey to a term of imprisonment for life as required for repeat offenders by 21 U.S.C. §§ 841 and 851, which provide in pertinent part as follows:

> If any person [distributes or intends to distribute 50 grams or more of methamphetamine, or 500 grams or more of a mixture containing a detectable amount of methamphetamine] after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release.

21 U.S.C. § 841(b)(1)(A).

> No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial . . . the United States attorney files an information with the court . . . stating in writing the previous convictions to be relied upon. . . . The court shall hold a hearing to determine any issues raised by [the defendant's] response [to the information] which would except a person from increased punishment. . . . The hearing shall be before the court without a jury and either party may introduce evidence. . . . [T]he United States

-45-

attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact.

21 U.S.C. § 851(a)(1), (c)(1).

On appeal, Jeffrey argues that his life sentence violates the Sixth Amendment because the sentence enhancement procedure of 21 U.S.C. § 851 actually sets forth elements of an offense which must be found by the jury rather than the judge.[11]  He contends that the jury should have found the following "elements":  that he was the defendant in the prior cases, that there were two separate convictions, that the convictions involved drug offenses, and that the convictions were felonies.  Jeffrey's argument was raised in the district court and is, accordingly, properly before us on appeal.

However, we are unpersuaded.  In Almendarez-Torres v. United States, 523 U.S. 224 (1998), the Supreme Court held that recidivism is "as typical a *sentencing factor* as one might imagine," id. at 230 (emphasis added), not an element of the offense that had to be charged in the indictment or submitted to the

---

[11]Jeffrey does not dispute on appeal the district court's factual determinations regarding his prior convictions.  The government at sentencing introduced five exhibits showing that Jeffrey had been convicted of the two prior drug felonies.  Jeffrey, in turn, produced a transcript of the state court proceedings and argued that it showed that he had one prior felony drug conviction rather than two.  The district court concluded that "it is clear that these are treated as separate offenses, and consequently, under 21 U.S. Code Section 851 the Court finds that Mr. Jeffrey [sic] is a career offender and that the provisions of 851 apply in this case."  Tr. of Sentencing Hr'g at 11-14.

jury.[12]  The Court reiterated this principle in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004), and <u>United States v. Booker</u>, 125 S. Ct. 738 (2005).  <u>Blakely</u>, 124 S. Ct. at 2536 ("'<u>Other than the fact of a prior conviction</u>, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" (emphasis added) (quoting <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000))); <u>Booker</u>, 125 S. Ct. at 756 ("Any fact (<u>other than a prior conviction</u>) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty must be admitted by the defendant or proved to the jury beyond a reasonable doubt." (emphasis added)).

Jeffrey has provided us with no good reason to deviate from these authorities when 18 U.S.C. § 851 is applied below.  We, and at least one other circuit, have already concluded that § 851 involves a sentencing enhancement properly applied by the judge.  <u>United States v. Thomas</u>, 398 F.3d 1058, 1063-64

---

[12]We note that in the recent case of <u>Shepard v. United States</u>, No. 03-9168, 544 U.S. __, 2005 WL 516494 (Mar. 7, 2005), Justice Thomas stated that a majority of the Court now recognizes that <u>Almendarez-Torres</u> was wrongly decided.  Justice Thomas also predicted that <u>Almendarez-Torres</u> would be overruled sometime in the near future.  <u>Shepard</u>, 2005 WL 516494, at *9 (Thomas, J., concurring).  Nonetheless, "we are bound by existing precedent to hold that the <u>Almendarez-Torres</u> exception to the rule announced in <u>Apprendi</u> [<u>v. New Jersey</u>, 530 U.S. 466 (2000)]  and extended to the Guidelines in [<u>United States v.</u>] <u>Booker</u>, [125 S. Ct. 738 (2005)] remains good law."  <u>Moore</u>, 2005 WL 668813, at *3.

(8th Cir. 2005) (reviewing § 851 life sentence post-Booker and concluding that jury need not have found facts of prior convictions); United States v. Wilson, 244 F.3d 1208, 1216-17 (10th Cir. 2001) (reviewing § 851 enhancement post-Apprendi and concluding that fact of prior conviction need not be submitted to jury).

Our conclusion is further supported by a recent case in which we examined the prior convictions exception in light of the argument that a jury had to find that the defendant's prior crimes were "violent felonies" in order for his sentence to be enhanced under the Armed Career Criminal Act. United States v. Moore, No. 04-8078, __ F.3d __, 2005 WL 668813, at *1 (10th Cir. Mar. 23, 2005). We concluded that "the government need not charge in an indictment and prove to a jury that a defendant's prior conviction constitutes a 'violent felony' under [the ACCA]." Id. at *5. Our reasoning was based, in part, on the principle that the determination of the fact of a prior conviction entails many subsidiary findings, properly made by a judge rather than a jury, that are "intimately related" to the question of whether a prior conviction exists. The conclusion that a conviction was for a "violent felony" was just such a subsidiary finding. Id. The reasoning of Moore forecloses Jeffrey's argument that the jury should have made findings as to what he argues are "elements" in § 851. Such questions are "intimately related" to the overall inquiry into the existence of the prior convictions, and therefore the findings were properly made by the judge. See United States v. Burgin, 388 F.3d

177, 186 (6th Cir. 2004) (subsidiary finding under recidivist statute that prior offenses were committed on "different occasions" need not have been submitted to a jury); United States v. Santiago, 268 F.3d 151, 156 (2d Cir. 2001) ("[T]he separateness of the convictions is not a fact which is different in kind from the types of facts already left to the sentencing judge by . . . Apprendi.").[13]

## CONCLUSION

For the foregoing reasons, Jeffrey's conviction and sentence are AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge

---

[13]In this case, we need not examine whether the district court committed non-constitutional Booker error by applying the Sentencing Guidelines in a mandatory, as opposed to discretionary, fashion. Booker, 125 S. Ct. at 769. While the court calculated Jeffrey's sentencing range under the Guidelines as 360 months to life, the mandatory life sentence was imposed pursuant to the statutory requirements of 21 U.S.C. §§ 841 and 851 and not the Guidelines. See United States v. Moore, No. 04-8078, __ F.3d __, 2005 WL 668813, at *1 n.1 (10th Cir. Mar. 23, 2005). We therefore have analyzed only the Sixth Amendment portion of Booker.