**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 10, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

DUSTIN ROBERT EASTOM,

    Defendant-Appellant.

No. 08-5015
(D.C. No. 4:07-CR-00037-CVE-1)
(N.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **HOLLOWAY**, and **O'BRIEN**, Circuit Judges.

---

**I. INTRODUCTION**

Defendant–appellant Dustin Robert Eastom appeals his convictions of possession of methamphetamine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(I). He asserts that (1) his motion to suppress was improperly denied; (2) testimony was improperly excluded at trial; and (3) there was insufficient evidence to support either conviction. We

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

have jurisdiction under 28 U.S.C. § 1291, and affirm.

## II. BACKGROUND

### A. The Motion to Suppress[1]

Mr. Eastom moved to suppress evidence obtained from his house after a police search and various incriminating statements he made to the police. The testimony of law enforcement personnel at the suppression hearing established the following: In January 2007, Officer Leland Ashley of the Tulsa Police Department received information about someone dealing drugs out of Mr. Eastom's residence. He decided to initiate contact with the assistance of three other Tulsa police officers and an ATF special agent.

Officer Ashley knocked on the door (with Officers Jeff Henderson and Shawn Hickey close by), and it was answered by a woman named Ladonna Wynn. Ms. Wynn lived at Mr. Eastom's house along with Mr. Eastom's daughter (who was also present when the officers arrived). The officers' guns were not drawn, nor were they visible. Using a "normal conversation type voice," Officer Ashley identified himself and said he was investigating a tip that there were drug sales from the residence. On direct examination, Officer Ashley stated that he asked if Ms. Wynn had a problem

---

[1]We summarize the pertinent evidence offered at the suppression hearing in the light most favorable to the government. *See United States v. Carter*, 511 F.3d 1264, 1267 (10th Cir. 2008) ("In reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government . . . .").

with them looking for drugs. Ms. Wynn said she did not. However, on cross-examination, Officer Ashley clarified that he asked if they could come inside and look around, and Ms. Wynn said she didn't care. Officer Henderson was unable to recall the exact words used.

The search of the house revealed methamphetamine and several firearms, and the officers brought the contraband into Mr. Eastom's living room. Shortly thereafter, Ms. Wynn wrote a witness statement. Officer Ashley asked her if she had given them consent to search the house, and Ms. Wynn replied that she had. Officer Ashley then told her she needed to put that information in the statement, and she did so.

Officer Ashley testified that the police did not threaten Ms. Wynn. The only other officer to speak to her other than Officer Ashley was Officer Henderson, and he used a regular conversation voice when speaking to Ms. Wynn. Officer Henderson (who was present when Ms. Wynn wrote her statement) testified that he never heard any officers threaten Ms. Wynn.

While the police were still at his house, Mr. Eastom arrived. The police drew their weapons (they had not drawn their weapons before this time), laid Mr. Eastom on the floor, and handcuffed Mr. Eastom. The officers' guns were then holstered. The police explained why they were there, and Mr. Eastom "immediately" began making statements about not wanting to go to jail. There was no testimony that this statement was in response to any questions by law enforcement.

Officer Ashley asked if Mr. Eastom would be willing to follow the police to a police station to fill out a witness statement. Mr. Eastom agreed and followed in his own vehicle. Officer Ashley testified that he never threatened or intimidated Mr. Eastom, nor did he tell Mr. Eastom anything that would require Mr. Eastom to cooperate against his will. At the station, Mr. Eastom read and signed a "Notification of Rights Waiver." Mr. Eastom completed a witness statement that indicated that the methamphetamine found at his home belonged to him. Mr. Eastom never indicated that he did not want to cooperate.

Ms. Wynn's recollection of the events was significantly different. Ms. Wynn testified that Officer Ashley pushed his way into Mr. Eastom's house without any discussion about the him coming into the house. Further, she testified that when later asked for permission to search, she denied her permission. She explained that Officer Ashley told her if she did not let him search they would get a warrant to search. She also testified that Officer Ashley showed her handcuffs and told her that if she did not cooperate he would arrest her and send Mr. Eastom's daughter into DHS custody. Ms. Wynn testified that she was scared.

She also testified that Officer Ashley began questioning Mr. Eastom shortly after Mr. Eastom arrived at the house, but she could not hear the questioning. Shortly after the search, Mr. Eastom told his attorney about the search, and Mr. Eastom's attorney drafted affidavits for Mr. Eastom and Ms. Wynn.

The district judge found the testimony of the law enforcement involved in the

search of Mr. Eastom's home to be credible, and found Ms. Wynn's version of the events to be not credible. The district judge found that Ms. Wynn had voluntarily consented to the search of the house. She further concluded that Mr. Eastom had not shown that he was interrogated or that the police engaged in conduct that was so inherently coercive that evidence should be suppressed. The district judge therefore denied Mr. Eastom's motion to suppress.

## B. The Trial[2]

At trial, Officer Henderson testified that he discovered a black duffle bag in the central bedroom of Mr. Eastom's house. Inside the duffle bag he found a .44 Magnum revolver, a .22 revolver, a pill bottle, and two sets of digital scales. The pill bottle contained 5.78 grams of a substance a forensic scientist testified contained methamphetamine. Officer Henderson explained that digital scales are used in the distribution of narcotics, and that he had never heard of a user weighing the narcotics before using them. He also testified that a surveillance camera was mounted on the front of Mr. Eastom's home, and that surveillance cameras and monitors were typically only used for distribution purposes.

ATF Special Agent Brandon McFadden testified that Mr. Eastom told the police at his house that he could "do" a drug dealer named Shane Fields and set up

---

[2]The evidence admitted at trial is summarized in the light most favorable to the government. *See United States v. Williams*, 403 F.3d 1188, 1194 (10th Cir. 2005) (holding that when reviewing a challenge to the sufficiency of the evidence, all evidence is viewed in the light most favorable to the government).

the dealer for an amount of methamphetamine. Special Agent McFadden testified that he had been present in interviews where Mr. Fields's name had been brought up as a large-scale methamphetamine dealer. Officer Henderson testified that a major distributor of methamphetamine would not likely deal directly with a user.

Officer Henderson also testified that a quarter gram of methamphetamine was a typical dosage unit, but that it was possible that a user might purchase more than one dosage unit at a time. He testified that he had learned from users that methamphetamine is "usually purchased on the amount you're going to use in one setting or at the time you plan to use it." Rec., vol. IV at 91. He explained that the largest amount that he had known a user to purchase at one time for ingestion was 3.5 grams.

During Officer Henderson's cross-examination, the defense counsel asked:

Q.   Would you agree with me that there isn't a specific bright line one could draw and say a certain quantity, less, under this line, would be always for personal use; and a certain quantity above this line would be always for distribution purposes? Would you agree with that?
A.   I would agree for just specifically talking about quantity.
Q.   Just quantity of drugs alone, correct?
A.   Yes, sir.

Officer Henderson also testified that in his opinion under the facts of the case the amount of drugs found was consistent with distribution purposes.

In addition, Mr. Eastom's written statement that he made at the police station was read to the jury. It stated:

-6-

On 2/8/07, police officers came to my house and found several guns and some weed and meth. I acknowledge that it's mine and not LaDonna Wynn's. A chick brought over some stuff that was hers, guns and some black bags and a white box. I wrote this on my own free will. The only weapon that the officer recovered that was mine was the [Sig Sauer].

During the presentation of his case, Mr. Eastom attempted to admit the testimony of a drug counselor named Rick Murray. Mr. Murray would have testified that he had encountered individuals who had purchased more than an eighth of an ounce (i.e., approximately 3.54 grams) at a given time for personal use. The district judge concluded that Mr. Murray's testimony was not reliable for purposes of giving an expert opinion, and refused to admit the testimony.

The jury found Mr. Eastom guilty of both possession of methamphetamine with the intent to distribute and possession of firearms in furtherance of a drug trafficking crime. This appeal followed.

## III. DISCUSSION

### A. Denial of the Motion to Suppress

In assessing a denial of a motion to suppress, this court accepts the factual findings of the district judge, and his or her determinations of witness credibility, unless they are clearly erroneous. *United States v. Chavez*, 534 F.3d 1338, 1343 (10th Cir. 2008). We view the evidence in the light most favorable to the government. *United States v. Andrus*, 483 F.3d 711, 716 (10th Cir. 2007). We may consider evidence introduced at the suppression hearing, and any evidence properly presented at trial. *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). Mr.

Eastom argues that his motion to suppress should have been granted because (1) Ms. Wynn did not voluntarily consent to the search, and (2) certain statements he made were obtained in violation of his Fifth Amendment rights.

### 1. Voluntariness of Ms. Wynn's Consent to Search

Mr. Eastom argues that Ms. Wynn's consent to search Mr. Eastom's home was not voluntary, and therefore the evidence obtained as a result of the search should have been suppressed. He first asserts that the district judge's finding that the officers' testimony was more credible than Ms. Wynn's testimony is clearly erroneous. In support, he points to an affidavit that was executed by Ms. Wynn concerning the search shortly after the search. He further argues that the consent's involuntariness is shown by the presence of five officers at the home of a young woman with a child, and by the failure to make known the right to refuse consent. We disagree.

Subject to limited exceptions, the Fourth Amendment prohibits warrantless searches of an individual's home or possessions. *Andrus*, 483 F.3d at 716. However, the "'Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained.'" *United States v. Thompson*, 524 F.3d 1126, 1132 (10th Cir. 2008) (quoting *Georgia v. Randolph*, 547 U.S. 103, 106 (2006)).

Importantly, "the Fourth Amendment requires that consent be voluntary and 'not be coerced, by explicit or implicit means, by implied threat or covert force.'" *Id.* at 1133 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)). The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue. *United States v. Iribe*, 11 F.3d 1553, 1557 (10th Cir. 1993). The government must show that the consent was unequivocal and specific, and that it was freely and intelligently given. *Id.* Voluntariness is a factual finding, and we review the district judge's determination of voluntariness for clear error. *Thompson*, 524 F.3d at 1133. The presence of more than one officer increases the coerciveness of an encounter, but that alone does not render consent per se involuntary. *Id.* at 1134. Further, "'knowledge of the right to refuse consent' is not 'a necessary prerequisite to demonstrating a "voluntary" consent.'" *Id.* (quoting *Schneckloth*, 412 U.S. at 232–33).

The district judge did not clearly err when she found that Ms. Wynn voluntarily consented to the search of Mr. Eastom's home. First, the district judge did not clearly err when she found the officers to be credible, and found Ms. Wynn to be not credible. The fact that Mr. Eastom's attorney prepared affidavits shortly after the events that may corroborate Ms. Wynn's version of events does not show that her testimony is more credible than the officers' testimony. The district judge was present during the live testimony of the witnesses. Just as the district judge was permitted to find Ms. Wynn's testimony not credible, she was permitted to discount

the credibility of Ms. Wynn's earlier affidavit.

Second, Officer Ashley testified that Ms. Wynn said she didn't care if the officers came inside and looked around. The officers also testified that during the encounter their guns were not visible, they used a normal conversation voice, and they did not threaten Ms. Wynn. While the presence of more than one officer at Mr. Eastom's home may have increased the coerciveness of the encounter, this fact alone does not render consent per se involuntary. *See Thompson*, 524 F.3d at 1134. Moreover, Ms. Wynn's knowledge of the right to refuse consent is not a necessary ingredient of a voluntary consent. *See id.* Therefore, the district judge did not clearly err in finding voluntary consent here.

## 2. Fifth Amendment Violations

Mr. Eastom clarified at oral argument that he is appealing the denial of the suppression of (1) his statement at his house that he did not want to go to jail, and (2) his written statement given at the police station.[3] He argues that his Fifth Amendment rights were violated in two ways. First, he argues that both statements were made involuntarily because the police "were effectively holding the threat of charges over his head." Second, he asserts that the statement given at his house resulted from an improper interrogation because he was "confronted with seized

---

[3]At oral argument, when clarifying which statements he made at his house that he was challenging, Mr. Eastom mistakenly included among the challenged statements his statement that the drugs belonged to him rather than his girlfriend. This statement was actually made in the written statement.

contraband." We conclude that the Fifth Amendment did not prohibit the admission of either of the challenged statements.

Even if a defendant's *Miranda* rights are not violated, his statements are inadmissible if they were made involuntarily. *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir. 1987). We review the district judge's determination of the ultimate issue of voluntariness *de novo*, viewing the totality of the circumstances. *United States v. Muniz*, 1 F.3d 1018, 1021–22 (10th Cir. 1993). The burden of proof is on the government to prove the statements were voluntary. *Id.* at 1021.

Further, if a person voluntarily speaks without interrogation by an officer, the Fifth Amendment's protection is not at issue, and the statements are admissible. *Id.* at 1022; *see United States v. Torres-Guevara*, 147 F.3d 1261, 1266 (10th Cir. 1998) ("Because the statement was volunteered, rather than given in response to any interrogation, [the] statement also was admissible in the absence of *Miranda* warnings.").

Here, both statements were given voluntarily by Mr. Eastom. Officer Ashley testified that he never threatened or intimidated Mr. Eastom. In addition, Mr. Eastom never indicated that he did not want to cooperate. In fact, Mr. Eastom read and signed a "Notification of Rights Waiver" before making his written statement.

Mr. Eastom argues that his statements were involuntary because the officers were "effectively holding the threat of charges over his head." In effect, he argues that a criminal suspect's knowledge of the potential for criminal prosecution is alone

-11-

sufficient to cause an individual's statements to be involuntary. However, if this were true, incriminating statements by individuals suspected of illegal activities would rarely be admissible.

The record also demonstrates that the challenged statement given by Mr. Eastom at his house was not obtained as a result of interrogation. Mr. Eastom's being "confronted with seized contraband" did not involve any questioning. Instead, it appears that this "confrontation" was the police explanation to him of why they were in his home and the possible presence of the seized items in his living room. This is alone insufficient to constitute interrogation. Therefore, Mr. Eastom's statements were not rendered inadmissible by the Fifth Amendment. *Cf. Orozco v. Texas*, 394 U.S. 324, 326 (1969) (holding that the Fifth Amendment, as construed in *Miranda v. Arizona*, required the exclusion of statements given by the defendant while he was questioned on his own bed by four officers).

## B. Exclusion of Rick Murray's Testimony

Mr. Eastom argues that the district judge erred in excluding the testimony of Rick Murray, an experienced drug counselor, and that this erroneous exclusion denied him an opportunity to present his defense. He asserts that the testimony would have impeached Officer Henderson's testimony and served as evidence that Mr. Eastom's methamphetamine possession was consistent with personal use. We find no reversible error in the exclusion.

Under Fed. R. Evid. 702, a district judge must be satisfied that the proposed

-12-

expert testimony is both reliable and relevant before permitting a jury to assess the testimony. *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006). The district judge's determination of reliability is reviewed for abuse of discretion. *Id.* However, a non-constitutionally erroneous decision to exclude evidence is considered harmless unless a substantial right of a party is affected. *United States v. Velarde*, 214 F.3d 1204, 1211 (10th Cir. 2000). A substantial right is affected when the error had a substantial influence on the outcome or leaves the court in grave doubt as to whether it had such an effect. *Id.*

The question of whether a constitutional violation has occurred is reviewed *de novo*. *United States v. Solomon*, 399 F.3d 1231, 1239 (10th Cir. 2005). The right to present a defense arises under the Fifth Amendment right to due process and the Sixth Amendment right to compulsory process. *Id.* We will reverse the district judge's decision excluding evidence only if the proffered evidence is both relevant and material (i.e., its exclusion would affect a trial's outcome). *United States v. Hernandez-Hernandez*, 519 F.3d 1236, 1238–39 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 162 (2008).

Here, even assuming that the district judge erred by excluding the testimony, we conclude that the exclusion was harmless and Mr. Eastom's right to present a defense was not violated. Mr. Murray's testimony would not have affected the trial's outcome. *See Velarde*, 214 F.3d at 1211 (holding that an erroneous decision to exclude evidence is considered harmless unless the error had a substantial influence

-13-

on the outcome or leaves this court in grave doubt as to whether it had such an effect); *Hernandez-Hernandez*, 519 F.3d at 1238–39 (holding that a decision excluding evidence will be reversed on constitutional grounds only if the evidence affects the trial's outcome).

At trial, Officer Henderson testified that methamphetamine is "usually purchased on the amount you're going to use in one setting or at the time you plan to use it." Rec., vol. IV at 91. He also testified that the largest amount that he had known a user to purchase at one time for ingestion was 3.5 grams. This testimony implies that if more than 3.5 grams are found on an individual, those drugs are probably for distribution rather than personal use.

However, on cross-examination, Officer Henderson admitted that he agreed that there was not a bright line one could draw to say that possession of drugs in a quantity above that line would always be for distribution purposes. Therefore, Officer Henderson left open the possibility that the 5.7 grams of methamphetamine found at Mr. Eastom's home were for personal use.

Mr. Murray would have testified that he had met individuals that had purchased more than 3.54 grams at a given time for personal use. Like Officer Henderson's testimony, Mr. Murray's testimony points to the possibility that the 5.7 grams of methamphetamine found at Mr. Eastom's home were for personal use. In other words, far from impeaching Officer Henderson's testimony, Mr. Murray's testimony would have essentially been cumulative.

Had Mr. Murray's testimony been presented to the jury, we are convinced it would not have altered the pool of evidence sufficiently to affect the outcome of the trial. Even with Mr. Murray's cumulative testimony, evidence that strongly indicates that the 5.7 grams of methamphetamine were for distribution would have remained before the jury. For example, the methamphetamine was found in a bag containing digital scales and firearms. Therefore, the exclusion is not reversible error.

## C. Sufficiency of the Evidence

We review sufficiency of the evidence claims *de novo*. *Williams*, 403 F.3d at 1194. In doing so, we view all evidence in the light most favorable to the government, ultimately determining whether the evidence and all reasonable inferences drawn therefrom could allow a reasonable jury to find the defendant guilty beyond a reasonable doubt. *Id.*

"'The jury, as fact finder, has discretion to resolve all conflicting testimony, weigh the evidence, and draw inferences from the basic facts to the ultimate facts.'" *United States v. Anderson*, 189 F.3d 1201, 1205 (10th Cir. 1999) (quoting *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998)). We do not weigh conflicting evidence or make credibility determinations, as these are exclusively functions of the jury. *United States v. Zapata*, 546 F.3d 1179, 1188 (10th Cir. 2008). We also do not review the evidence in "bits and pieces," but we evaluate the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole. *United States v. Parker*, _ F.3d _, _ (10th Cir. 2009). Mr.

Eastom argues that insufficient evidence was presented to sustain either of his convictions.

### 1. Possession of Methamphetamine with the Intent to Distribute

Mr. Eastom argues that there is insufficient evidence to sustain his conviction for possession of methamphetamine with the intent to distribute. We conclude that sufficient evidence was presented to convict Mr. Eastom of this offense.

21 U.S.C. § 841(a)(1) makes it unlawful to knowingly or intentionally possess with the intent to distribute a controlled substance. 21 U.S.C. § 841(a)(1). "To sustain a conviction for possession with intent to distribute, the government must prove beyond a reasonable doubt that a defendant: '(1) possessed the controlled substance; (2) knew he possessed the controlled substance; and (3) intended to distribute or dispense the controlled substance.'" *United States v. Montgomery*, 468 F.3d 715, 719 (10th Cir. 2006) (quoting *United States v. McKissick*, 204 F.3d 1282, 1291 (10th Cir. 2000)).

Possession may be either actual or constructive. *United States v. Triana*, 477 F.3d 1189, 1194 (10th Cir. 2007), *cert. denied*, 127 S. Ct. 2928 (2007). Constructive possession may be found if a person knowingly has ownership of the narcotics and the premises where they are found. *Id.* However, when the contraband may be attributed to more than one individual, constructive possession requires some connection between the defendant and the contraband. *Id.* Further, the presence of firearms and "tools of the drug trade," such as scales, may go toward proving that

a defendant possessed drugs with the intent to distribute. *Id.* at 1195; *United States v. Allen*, 235 F.3d 482, 492 (10th Cir. 2000).

Turning to the facts on this case, we are confident that sufficient evidence was presented to convict Mr. Eastom of possession of methamphetamine with the intent to distribute. At trial, Mr. Eastom's written statement was read to the jury. It stated:

> On 2/8/07, police officers came to my house and found several guns and some weed and meth. I acknowledge that it's mine and not LaDonna Wynn's. A chick brought over some stuff that was hers, guns and some black bags and a white box. I wrote this on my own free will. The only weapon that the officer recovered that was mine was the [Sig Sauer].

From this statement a reasonable jury could conclude beyond a reasonable doubt that Mr. Eastom both possessed the methamphetamine and knew that he possessed it.

In addition, Officer Henderson testified that he discovered a black duffle bag in the central bedroom of Mr. Eastom's house that contained two firearms, two digital scales, and a pill bottle. *See Allen*, 235 F.3d at 492 (holding that the presence of firearms may go toward proving that a defendant possessed drugs with the intent to distribute). A Tulsa forensic scientist testified that the same pill bottle contained 5.78 grams of a substance that contained methamphetamine. Officer Henderson further testified that digital scales are used in the distribution of narcotics, and that he had never heard of a user weighing the narcotics before using it. *See Triana*, 477 F.3d at 1195 (explaining that the presence of scales was evidence of an intent to distribute).

Moreover, a surveillance camera was mounted on Mr. Eastom's home, and

-17-

Officer Henderson testified that surveillance cameras were typically for distribution purposes. Mr. Eastom also offered to assist the police in investigating a major methamphetamine dealer, and Officer Henderson testified that a major dealer would not likely deal directly with a mere user.

From the testimony at trial a reasonable jury could find beyond a reasonable doubt that Mr. Eastom intended to distribute the methamphetamine. Therefore, it was reasonable for the jury to find Mr. Eastom guilty of possession of methamphetamine with the intent to distribute.

## 2. Possession of Firearms in Furtherance of a Drug Trafficking Crime

Mr. Eastom further argues that insufficient evidence was presented to sustain his conviction for possession of a firearm in furtherance of a drug trafficking crime. He argues that there is insufficient evidence of a nexus between the guns recovered and the drugs. We find that there was sufficient evidence of a nexus.

To obtain a conviction for possession of a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c)(1), the government must demonstrate that the defendant possessed the firearm in furtherance of the underlying crime. *United States v. Avery*, 295 F.3d 1158, 1179 (10th Cir. 2002). A firearm that is kept available for use if needed during a drug transaction is possessed in furtherance of drug trafficking so long as such possession is intended by the drug trafficker. *United States v. Robinson*, 435 F.3d 1244, 1251 (10th Cir. 2006). Several factors may facilitate proof of this circumstantial evidence of the defendant's intent. *Id.* These

factors are: (1) the type of drug activity being conducted, (2) the accessibility of the firearm, (3) the type of firearm, (4) the legal status of the firearm, (5) whether the firearm is loaded, (6) the proximity of the firearm to drugs or drug profits, and (7) the time and circumstances under which the firearm is found. *Id.*

For example, in *United States v. Lott*, we held that "the placement of a loaded, semi-automatic weapon on the driver's seat of the car in which the instrumentalities of methamphetamine manufacturing were also found is sufficient evidence from which a jury could conclude" that the gun was used in furtherance of the drug crime. *United States v. Lott*, 310 F.3d 1231, 1248 (10th Cir. 2002).

Here, there is sufficient evidence that the firearms were possessed in furtherance of Mr. Eastom's underlying methamphetamine crime. Officer Henderson testified that he discovered a black duffle bag in the central bedroom of Mr. Eastom's house that contained two firearms, two digital scales, and a pill bottle. A forensic scientist testified that the same pill bottle contained 5.78 grams of a substance that contained methamphetamine.

Having already properly found that the methamphetamine was possessed with the intent to distribute it, it would be reasonable for the jury to infer that Mr. Eastom used the bag when conducting drug transactions. The accessability of the firearms and their proximity to the drugs during these transactions allowed a reasonable jury to find that Mr. Eastom possessed the firearms in furtherance of his drug crime. *See Robinson*, 435 F.3d at 1251 (explaining the accessibility of the firearm and the

proximity of the firearm to the drugs as factors that may facilitate proof that the defendant possessed a firearm in furtherance of a drug trafficking crime); *Lott*, 310 F.3d at 1248 (holding that the placement of a loaded weapon on the driver's seat of a car carrying drug instrumentalities was sufficient evidence of possession in furtherance of a crime). Therefore, sufficient evidence was presented to sustain the firearms verdict.

## IV. CONCLUSION

We conclude that Mr. Eastom's motion to suppress was properly denied. Finding Ms. Wynn's consent to be voluntary was not clearly erroneous, and Mr. Eastom's Fifth Amendment rights were not violated. Also, the exclusion of Mr. Murray's testimony, if erroneous, did not affect the trial's outcome. Therefore, the exclusion cannot lead to reversal. Finally, there was sufficient evidence to allow a reasonable jury to find that Mr. Eastom possessed the methamphetamine with the intent to distribute it and possessed the firearms to further that purpose. Accordingly, we **AFFIRM**.

IT IS SO ORDERED.

Entered for the Court,

William J. Holloway, Jr.
Circuit Judge

-20-